UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
LURADINE TIMBERLAKE,

               Plaintiff,

                                  05 CV 5616 (LAP)

      - against -

NEW YORK PRESBYTERIAN HOSPITAL,

               Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## **DEFENDANT'S MEMORANDUM OF LAW IN**
## **SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

James S. Frank, Esq.
Steven M. Post, Esq.
Epstein Becker & Green, P.C.
250 Park Avenue
New York, New York 10177
212-351-4500

## TABLE OF CONTENTS

STATEMENT OF FACTS ........................................................................................................ 2

APPLICABLE LEGAL STANDARDS ................................................................................... 6

ARGUMENT ............................................................................................................................ 8

TIMBERLAKE HAS NOT RAISED A MATERIAL ISSUE OF FACT WITH RESPECT TO HER CLAIMS OF DISCRIMINATION AND RETALIATION ............................................... 8

I. Timberlake Has Not Established A Prima Facie Case of Discrimination or Retaliation ...... 8

II. There Is No Evidence In The Record Showing Pretext ............................................. 10

III. Timberlake's Complaint Should be Dismissed in its Entirety. ................................. 12

A. Assuming Arguendo that the Court Exercises Supplemental Jurisdiction over Timberlake's State Law Claims, They Should be Dismissed. ........................................................... 12

    1. Timberlake's State Law Claims for Race and Age Discrimination and Retaliation are Not Supported by any Evidence. ........................................................................................ 12

    2. Timberlake Has Failed To Establish Her Claim Under The New York Whistleblower Law ................................................................................................................................ 13

CONCLUSION ...................................................................................................................... 15

# TABLE OF AUTHORITIES

## CASES

Butts v. New York City Dept. of Hous. Preservation and Dev., 2007 U.S. Dist. LEXIS 6534 (S.D.N.Y. 2007) ..................................................................................................10

D'Amico v. City of New York, 132 F.3d 145 (2d Cir. 1998) ................................................7

Deshpande v. TJH Medical Svcs., P.C., 2008 NY Slip Op 5649; 52 A.D.3d 648; 861 N.Y.S.2d 697 (2d Dept. 2008) ..................................................................................13

Jute v. Hamilton Sundstrand Corp., 420 F.3d 166 (2d Cir. 2005) ........................................7

Kessler v. Westchester Cty. Dep't of Soc. Svcs., 461 F.3d 199 (2d Cir. 2006) ....................7

Kolari and Vail v. New York-Presbyterian Hospital, 455 F.3d 118 (2d Cir. 2006) ............12

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) ..........................................................................................................................6

Meacham v. Knolls Atomic Power Lab., 461 F.3d 134 (2d Cir. 2006) ................................6

Patterson v. County of Oneida, 375 F.3d 206 (2d Cir. 2004) ..............................................7

Payami v. City of New York, 2007 U.S. Dist. LEXIS 25851 (S.D.N.Y. 2007) ....................7

Pipia v. Nassau Cty., 34 A.D.3d 664, 826 N.Y.S.2d 318 (2d Dept. 2006) ........................14

Quinn v. Green Tree Credit Corp., 159 F.3d 759 (2d Cir. 1998) ........................................7

Schwapp v. Town of Avon, 118 F.3d 106 (2d Cir. 1997) ....................................................7

Smith v. American Express Co., 853 F.2d 151 (2d Cir. 1988) ............................................8

St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) ....................................................................................................................7, 10

Torres v. Pisano, 116 F.3d 625 (2d Cir. 1997) ....................................................................6

## STATUTES

42 U.S.C. § 1981 ..................................................................................................................2

29 U.S.C. § 621 et seq. ........................................................................................................2

29 U.S.C. § 623(d) ..................................................................................................................9

42 U.S.C. § 2000e et seq ..........................................................................................................2

N.Y. Exec. Law § 290 et seq ....................................................................................................2

N.Y. Labor Law § 741 .................................................................................................2, 13, 14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x
LURADINE TIMBERLAKE,

                 Plaintiff,

          - against -

NEW YORK PRESBYTERIAN HOSPITAL,

                 Defendant.
------------------------------------- x

05 CV 5616 (LAP)

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant The New York and Presbyterian Hospital ("Hospital" or "Defendant"), by its attorneys Epstein Becker & Green, P.C., respectfully submits this Memorandum of Law in support of its motion for summary judgment dismissing the Complaint of plaintiff Luradine Timberlake ("Timberlake" or "Plaintiff").[1]

Timberlake was employed by the Hospital as a staff nurse in the Hospital's ambulatory women's health practice. Timberlake had a history of being disciplined by several Hospital supervisors concerning her behavior and job performance. In March 2004, Timberlake was suspended for issuing medication to a patient without a physician's prescription. During Timberlake's suspension, the Hospital discovered dozens of unfiled patient laboratory results reports under Timberlake's desk. Upon Timberlake's return to work, she refused to explain why the lab results were under her desk or to cooperate with the Hospital's inquiry regarding whether the patients had been notified of their results.[2] Based on her entire employment record, attitude

---

[1] All of the Exhibits referred to herein are annexed to the Affirmation of Steven M. Post accompanying the Hospital's motion.

[2] Of 495 patient lab results among the documents, 30 were abnormal lab results (see Ex. 8) which required immediate patient notification for possible follow-up treatment. After the documents were inventoried by Denise

and improper conduct which affected the delivery of patient care, the Hospital terminated Timberlake's employment on March 26, 2004. While the Complaint alleges that Timberlake's termination and the prior disciplinary measures were based on her race and age, and/or in retaliation for allegedly exercising statutory rights, the deposition testimony and record evidence does not contain even a scintilla of evidence to demonstrate unlawful conduct, unlawful motivation or pretext.[3] In short, the allegations of the Complaint are totally unsupported. Accordingly, the Hospital is entitled to summary judgment and the Complaint should be dismissed in its entirety.

## STATEMENT OF FACTS

Timberlake is an African-American who was born on June 26, 1949 (Comp. ¶ 5(a)). She was hired by the Hospital on June 12, 1972 as a registered nurse (Ex. 13, p. 13), and began working as a staff nurse in the Hospital's ambulatory women's health practice in 1974 (id., p. 20-21). Timberlake was employed as a staff nurse until her employment was terminated by the Hospital on March 26, 2004 (id., p. 21).[4]

During her employment, Timberlake was supervised by the Practice Manager for the ambulatory women's health practice, who in turn reported to a Director of Nursing (id., p.

---

Strand, the lab results that had come back as "abnormal" were reviewed by Dr. Debra Taubel, the Medical Director for the women's health clinic (Ex. 15, p. 186; Ex. 17, pp. 23-25, 51-53), and the affected patients were contacted by Strand or the two other clinic staff nurses (Ex. 15, pp. 203-04). The original documents were then filed in the appropriate patient charts (Ex. 15, pp. 170-72, 184-85), as they should have been in the normal course so the patient's physician would have the patient's entire medical history (Ex. 17, pp. 49-50).

[3] In her Complaint, Timberlake alleged claims under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq. ("Title VII"); 42 U.S.C. § 1981 ("Section 1981"); the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"); the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. ("NYHRL"); and the New York State whistleblower law, N.Y. Labor Law § 741, alleging that from 2002 to and including her termination on March 26, 2004, she was subjected to discrimination on the basis of her age and race, and to retaliation for "reasonably" complaining of discrimination and "departures from the expected standard of medical care owed to patients."

[4] Timberlake was deposed over two days, but the pagination for the transcript of the first day was not carried over to the second day. Accordingly, excerpts from the transcript of the February 27, 2006 session are contained in Exhibit 13 of the Affirmation of Steven M. Post, and excerpts from the transcript of the March 22, 2006 session are contained in Exhibit 14.

17-18). During 2001, the Practice Manager was Ellen Hawa (Caucasian). Subsequently, Yvonne Phipps (African-American) was the Practice Manager until the spring or summer of 2003, when she was succeeded by Denise Strand (Caucasian) in September 2003 (id., p. 27-30).[5] The Director of Nursing was Beryl Earle (African-American) from 2000 until mid-2003 when she was succeeded by Gayle Kolt (Caucasian) (id., p. 30). According to Timberlake, all of her supervisors other than Hawa were women who were in their late 40's or 50's (id., p. 30-31).

During at least the last 15 years of her employment, Timberlake was one of three full time staff nurses assigned to the ambulatory women's health practice (id., p. 27). For that entire period, Eun Sook Cha (Asian) held one of those positions; Emma Doctor (African-American), who had held the other position for approximately 15 years, retired and was replaced by Norma Robinson (African-American) in the spring of 2003 (id., p. 26-27). Cha and Doctor were older than Timberlake, while Robinson was a few years younger (id., p. 31-32).

Timberlake had received numerous disciplinary measures and a performance improvement plan prior to the Hospital's decision to terminate her employment on March 26, 2004.

On March 20, 2003, Earle gave Timberlake a written warning concerning her "inappropriate behavior" during a staff meeting, because during the meeting, Timberlake "became increasingly hostile, very aggressive tone, and walked out of the meeting before the meeting was ended" (Ex. 1; see also Ex. 14, p. 67-73; Ex. 16, 10-11).[6]

---

[5] Patricia Deely (Caucasian) held the position of Acting Practice Manager for several months in the summer and fall of 2003, until Strand's hire (Ex. 13, p. 174).

[6] Earle's description of Timberlake's behavior was corroborated by another Hospital employee, Cirila Quiguyan, who also testified that she was present at another meeting between Timberlake and Phipps, where plaintiff acted in a hostile manner and walked out prior to the end of the meeting (Ex. 16, p. 22-23).

On September 8, 2003, Timberlake received a written warning from Deely, for failing "to follow unit based procedure regarding the tracking and communicating of lab results" (Ex. 2).

In October 2003, Strand gave Timberlake a verbal warning concerning her inappropriate behavior towards one of the clinic's physicians (Ex. 3; see also Ex. 15, pp. 83, 85-90).

On December 29, 2003, Timberlake received a written warning from Strand for, again, failing to follow unit based procedure regarding the tracking and communicating of lab results (Ex. 4).

On February 17, 2004, Strand gave Timberlake her annual evaluation, in which Timberlake received an overall rating of "Needs Improvement," primarily as a result of poor marks in the categories dealing with interpersonal relationships and communications with coworkers (see Ex. 5). Among other things, the evaluation noted that Timberlake was "often angry when approached about changes [and] defensive when constructively criticized," and "often seen as unapproachable by techs and other staff" (id.).[7] In an effort to improve Timberlake's job performance, the Hospital gave Timberlake a specific "Work Improvement Plan" which was directed at improving her patient follow-up, reporting of test results and documentation (Ex. 6).

Less than a month later, on March 12, 2004, Timberlake dispensed medication to a patient without a physician's order (Ex. 7).[8] For this conduct Timberlake was suspended for three days by Strand. When Strand met with Timberlake to tell her of the suspension and

---

[7] Strand testified that Robinson constantly complained about her inability to work with Timberlake (Ex. 15, p. 30, 85-86). Quiguyan testified that Timberlake was "always mad" and "defensive" (Ex. 16, p. 11).

[8] Timberlake admitted that she actually did dispense medication without a physician's order, but testified that she was justified in doing so in the circumstances (Ex. 13, pp. 179-80).

provide her with the written notification, Timberlake crumpled the notice, stared at Strand for a minute, then turned around without saying anything and walked out of Strand's office, slamming the door in the process (id.; Ex. 15, p. 230).

During the days that Timberlake was serving the suspension, hundreds of unfiled patient-treatment documents (including 495 patient lab results dating back to March 2003) were discovered under Timberlake's desk (Ex. 15, pp. 149-50, 154, 157-61, 183-84, 190, 195; see also Ex. 8). These reports appeared to have not been reported to the patients or their physicians. On the morning of the first day of Timberlake's return to work on March 18, 2004, she was called into Strand's office, presented with the documents, and asked whether she had any explanation for them being under her desk (Ex. 9; Ex. 13, p. 38; Ex. 15, p. 168-69, 204-05). Timberlake looked at the documents, responded "no" and simply stared at Strand (Ex. 9; Ex. 13, pp. 38-39, 190-91; Ex. 15, pp. 168-69). Although Timberlake later testified that the documents did not appear to be the same as those that she had admittedly been keeping under her desk (Ex. 13, p. 182-83), Timberlake said nothing at the time, nor did she provide any information whatsoever other than her one-word response (Ex. 9; Ex. 13, p. 190). Strand then told Timberlake that she was suspended pending the Hospital's investigation of the matter, and accompanied her off the premises (Ex. 9; Ex. 13, p. 184).

As a result of Timberlake's behavior and lack of cooperation regarding an important patient care matter, coupled with her long-term noncompliance with Hospital standards of behavior and performance issues, the Hospital terminated Timberlake's employment, effective March 26, 2004 (Ex. 10).

Timberlake was subsequently replaced by an African-American female (Ex. 15, p. 36, 45).

## APPLICABLE LEGAL STANDARDS

To establish a <u>prima facie</u> claim of discrimination under Title VII, Section 1981, the ADEA or the NYHRL, a plaintiff must show that she (a) is a member of a protected class, (b) was qualified for her position, and (c) suffered an adverse employment action (d) under circumstances giving rise to an inference of discrimination. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).[9]

"Once [Timberlake] establishes a *prima facie* case of discrimination by a preponderance of the evidence, the burden shifts to [the Hospital] to offer a legitimate, nondiscriminatory reason for the allegedly wrongful conduct. <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802. If [the Hospital] offers a legitimate, nondiscriminatory reason for its behavior, the presumption of discrimination drops out and the burden shifts back to [Timberlake] to show, by a preponderance of the evidence, that that the reason given by [the Hospital] is simply a pretext for discrimination. <u>Id.</u> at 804. If [Timberlake] cannot prove the presence of such a pretext by a preponderance of the evidence, then summary judgment is appropriate. See <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d 456, 470 (2d Cir. 2001) ("[W]e can find no evidence to suggest that Delta's stated non-discriminatory reasons for the challenged employment actions were false. Therefore, we are led to the conclusion that summary judgment was appropriate in this case.")." <u>Aneja v. M.A. Angeliades, Inc.</u>, 2008 U.S. Dist. LEXIS 30602, at *15 (S.D.N.Y. 2008).

---

[9] "The analysis for discrimination based on a violation of the ADEA is identical to the burden shifting framework used for a claim based on discrimination under Title VII as articulated in <u>McDonnell Douglas Corp</u>. See <u>Roge v. NYP Holdings, Inc.</u>, 257 F.3d 164, 168 (2d Cir. 2001) ("The framework for establishing a prima facie case of discrimination under Title VII of the Civil Rights Act of 1964 . . . also applies to ADEA claims."). .... Claims brought under the NYHRL are subject to the same analysis as Title VII and ADEA claims. <u>See, e.g.</u>, <u>Meacham v. Knolls Atomic Power Lab.</u>, 461 F.3d 134, 146 (2d Cir. 2006) ("Since claims under the [NY]HRL are analyzed identically to claims under the ADEA . . . the outcome of an employment discrimination claim made pursuant to the [NY]HRL is the same as it is under the ADEA.") (internal quotation marks omitted); <u>Torres v. Pisano</u>, 116 F.3d 625, 629 n. 1 (2d Cir. 1997) ("We have repeatedly noted that claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII.")." <u>Aneja</u>, at *16-17.

"Retaliation claims under Title VII are [also] evaluated under a three-step burden-shifting analysis." Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005) (citing Quinn v. Green Tree Credit Corp.,159 F.3d 759, 768 (2d Cir. 1998)).[10] "In this regard, a retaliation claim follows the familiar burden-shifting framework developed to evaluate allegations of disparate treatment." Jute, 420 F.3d at 173 (citing, inter alia, McDonnell Douglas, 411 U.S. at 802-05).

"In order to present a prima facie case of retaliation under Title VII . . . , a plaintiff must adduce 'evidence sufficient to permit a rational trier of fact to find (1) that she engaged in protected participation or opposition under Title VII . . . , (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.'" Kessler, 461 F.3d at 205-06 (quoting Cifra v. GE, 252 F.3d 205, 216 (2d Cir. 2001)).

"A reason cannot be proved to be a pretext . . . unless it is shown both that the reason was false, and that discrimination was the real reason." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) (internal quotation marks omitted). For the purposes of a summary judgment motion, a plaintiff, like Timberlake, must produce evidence in the record that shows that there is a genuine issue of fact. In discrimination cases, a "plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment," Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997); rather, a plaintiff "must offer some hard evidence showing that [her] version of the events is not wholly fanciful," D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998); see also Patterson v.

---

[10] The burden-shifting McDonnell Douglas analysis applies to retaliation claims under the ADEA, Section 1981 and the NYHRL as well. See Kessler v. Westchester Cty. Dep't of Soc. Svcs., 461 F.3d 199, 205 (2d Cir. 2006) (ADEA); Payami v. City of New York, 2007 U.S. Dist. LEXIS 25851,at *12 (S.D.N.Y. 2007).

County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004); Smith v. American Express Co., 853 F.2d 151, 154-55 (2d Cir. 1988) (affirming summary judgment in light of plaintiff's failure to present more than conclusory and substantially unsupported assertions that employer's proffered race-neutral rationale for denial of promotion was pretext).

## ARGUMENT

### TIMBERLAKE HAS NOT RAISED A MATERIAL ISSUE OF FACT WITH RESPECT TO HER CLAIMS OF DISCRIMINATION AND RETALIATION

The Hospital respectfully submits that Timberlake has not satisfied any of her evidentiary burdens and that her Title VII, Section 1981, ADEA and NYHRL claims must be dismissed.

### I. Timberlake Has Not Established A Prima Facie Case of Discrimination or Retaliation

The Complaint only alleges two instances of alleged discriminatory treatment: a May 2002 "disciplinary memorandum ... concerning her alleged 'absenteeism'" (Comp. ¶ 5(l)) (which Timberlake testified was actually only a verbal caution, see Ex. 14, p. 91-92),[11] and an alleged August 2002 false accusation of refusing to treat a patient (Comp. ¶ 5(m)).[12] There is nothing in the record showing that either of these counselings adversely affected Timberlake's employment. In fact, Timberlake testified that no disciplinary action was taken with respect to the August 2002 matter and that it was dropped (Ex. 14, p. 17-18). More importantly, there is no evidence in the record to support the Complaint's assertion that both counselings were based on

---

[11] While Timberlake testified that the verbal caution was given by Deely, Deely was not Timberlake's supervisor in May 2002. Rather Phipps, an African-American close in age to Timberlake, was her supervisor at that time. Deely was Timberlake's supervisor during the middle of 2003, when Timberlake received a written warning concerning her absenteeism, which disciplinary action Timberlake testified was wholly appropriate and in conformity with the Hospital's policies (see Ex. 14, p. 91).

[12] All of the remaining events identified in the Complaint are alleged to have been retaliatory, as discussed below.

- 8 -

Timberlake's race and age. Accordingly, neither of the alleged events suffices to establish a prima facie case of discrimination under the McDonnell Douglas standard.

Timberlake has also failed to establish a prima facie case of unlawful retaliation. The record evidence shows that Timberlake did not engage in any protected activity under the ADEA, which by definition requires opposition to an unlawful employment practice or participation in an investigation or proceeding under the ADEA. See 29 U.S.C. § 623(d). When asked whether she had ever made any complaint to the Hospital of being treated differently because of her age, Timberlake did not answer affirmatively. Rather, she pointed to (i) a single reference that she wrote in her March 2003 memo (Ex. 11) that she was "a senior nurse on this unit (30+ years)", and (ii) an alleged complaint to Strand about a co-worker "looking up my nursing license on the computer" (Ex. 13, pp. 103-04, 124-25). On neither occasion was an unlawful employment practice even identified, much less opposed by Timberlake; and neither event constituted "protected activity" under the ADEA.

The record further establishes, pursuant to well settled law in this Circuit, the absence of any causal connection between the Hospital's of termination of Timberlake's employment and any alleged activity protected by Title VII, Section 1981 or the ADEA. Timberlake testified that she made no written complaint opposing any alleged racially motivated employment practice or otherwise relating to race (Ex. 13, pp. 100-01); see also Exs. 11, 12). While she testified that she made a verbal complaint to the Hospital's Human Resources Department in 2002 and March 2003 (Ex. 13, pp. 77-79) – a full year before her termination, and at least six months before any of the purportedly retaliatory acts alleged in the Complaint that led to her termination (see Comp. ¶ 5(p)-(t)) – Timberlake produced no evidence of having engaged in any statutorily protected activity under Title VII or Section 1981. In the absence of any other

evidence, the length of time between the alleged protected activity in March 2003 and her termination in March 2004 precludes any finding of a causal nexus. See Butts v. New York City Dept. of Hous. Preservation and Dev., 2007 U.S. Dist. LEXIS 6534, at *18 (S.D.N.Y. 2007) ("The longer the time between a plaintiff's protected activity and the adverse employment action, the weaker the inference of discriminatory retaliation. In general, a time differential of greater than three months, without additional direct evidence of discrimination, is insufficient to survive summary judgment.") (citing Gilford v. City of New York, 2004 U.S. Dist. LEXIS 13150, at *7 (S.D.N.Y. 2004) (citing cases)).

## II.     There Is No Evidence In The Record Showing Pretext

Even assuming, arguendo, that Timberlake has established a prima facie case of discrimination or retaliation under Title VII, Section 1981 or the ADEA, the Hospital is entitled to summary judgment because there is no evidence in the record showing that the Hospital's "legitimate, non-discriminatory and non-retaliatory reasons" for terminating Timberlake's employment and the disciplinary measures leading to her termination were in any manner pretextual, i.e., that they were false and motivated by discriminatory or retaliatory animus, St. Mary's Honor Center, 509 U.S. at 515. To the contrary, the record shows that Timberlake engaged in repeated inappropriate conduct despite the Hospital's efforts to have her improve her job performance. The specifics are not disputed, as Timberlake admitted that on March 18, 2004, she refused to cooperate with the Hospital's inquiry concerning the patient-related documents found under her desk (see Ex. 10). Timberlake also admitted to having dispensed medication without a physician's order on March 9, for which she received a three-day suspension. Strand's testimony of Timberlake's insubordinate behavior upon being informed of the suspension stands uncontradicted in the record. Although Timberlake disagreed with part of Strand's year-end evaluation of Timberlake's performance for 2003 (Ex. 5), Timberlake testified

that she did not disagree with the need for the work improvement plan that was issued in conjunction with that evaluation (Ex. 14, p.110; Ex. 6). Timberlake also did not disagree with Strand's description of the October 2003 disagreement between Timberlake and Stechna which led Strand to give Timberlake a verbal warning concerning her inappropriate behavior (Ex. 15, pp. 85-90). While Timberlake did dispute the basis for Earle's March 2003 written warning concerning Timberlake's inappropriate behavior during a staff meeting, such dispute is not material, as Earle is an African American female like plaintiff.[13]

In addition to the absence of any evidence casting doubt on the truth of the Hospital's articulated reasons for its actions, the record is devoid of any evidence establishing that the Hospital was motivated by discriminatory or retaliatory animus. Notwithstanding the conclusory allegations in the Complaint, there is no testimonial or documentary evidence that Timberlake was treated differently than any other employee. There is no evidence that Timberlake or any other employee was criticized or referred to in racially derogatory or degrading terms. There is nothing in the record even suggesting that Strand, who was not employed by the Hospital until September 2003, was aware of Timberlake's alleged verbal complaints in 2002 and March 2003.

In contrast, the evidence does show that both Earle and Phipps were African-American (Ex. 13, p. 29-30); that Timberlake's replacement was African-American (Ex. 15, p. 36, 45); and that both Cha, who is Asian and older than Timberlake, and Robinson, an African-American (of Cuban origin) who was only a few years younger than Timberlake, remained employed by the Hospital after Timberlake's termination (Ex. 15, p. 36, 53).

---

[13] Earle's account was corroborated by another witness, who also testified that on another occasion Timberlake had acted in a hostile manner and walked out of a meeting with she and Phipps (Ex. 16, pp. 10-11, 22-23).

In sum, Timberlake has neither established a prima facie case of discrimination or retaliation, nor proved that the Hospital's articulated legitimate reasons for its actions were a pretext for discrimination or retaliation. Therefore Timberlake's claims under Title VII, Section 1981, the ADEA and the NYHRL must be dismissed.

### III. Timberlake's Complaint Should be Dismissed in its Entirety.

Since all of Timberlake's federal claims, brought pursuant to Title VII, Section 1981 and the ADEA, are insufficient, the Hospital is entitled to summary judgment and dismissal of the entire Complaint for lack of subject matter jurisdiction. Without any basis for the Court's jurisdiction, Timberlake's remaining claims based on the NYHRL and Section 741 of the New York State Labor Law should likewise be dismissed for lack of jurisdiction. See Kolari and Vail v. New York-Presbyterian Hospital, 455 F.3d 118, 123 (2d Cir. 2006).

#### A. Assuming Arguendo that the Court Exercises Supplemental Jurisdiction over Timberlake's State Law Claims, They Should be Dismissed.

##### 1. Timberlake's State Law Claims for Race and Age Discrimination and Retaliation are Not Supported by any Evidence.

Claims brought pursuant to the NYHRL are analyzed using the same standards as those applied under federal law. See supra, p. 6 n. 9, 7 n.10. Therefore Timberlake's failure to establish any valid Title VII, Section 1981 and ADEA retaliation or race or age discrimination claims necessarily means that she has failed to establish her state law claims. Accordingly, assuming arguendo that the Court exercises supplemental jurisdiction over Timberlake's state law claims, her state law claims should be dismissed for the same reasons as her Title VII, Section 1981 and ADEA claims.

## 2. Timberlake Has Failed To Establish Her Claim Under The New York Whistleblower Law

Section 741 of New York's Labor Law provides:

> 2. Retaliatory action prohibited. Notwithstanding any other provision of law, no employer shall take retaliatory action against any employee because the employee does any of the following:
>
> (a) discloses or threatens to disclose to a supervisor, or to a public body an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care; or
>
> (b) objects to, or refuses to participate in any activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care.

N.Y. Labor Law § 741.

Section 741 defines "improper quality of patient care" as, "with respect to patient care, any practice, procedure, action or failure to act of an employer which violates any law, rule, regulation or declaratory ruling adopted pursuant to law, where such violation relates to matters which may present a substantial and specific danger to public health or safety or a significant threat to the health of a specific patient." Id. § 741(1)(d).

Here, the Complaint alleges only that the Hospital "retaliated against plaintiff because he [sic] reasonably complained about departures from the expected standard of medical care owed to patients" (Comp. ¶ 16; see also id. ¶ 5(o), (q)-(s), (w)). There is no "law, rule, regulation or declaratory ruling adopted pursuant to law" identified in the Complaint, much less alleged to have been violated. Nor is it alleged that there existed a "a substantial and specific danger to public health or safety or a significant threat to the health of a specific patient." In short, on its face the Complaint fails to state a claim under Section 741. See Deshpande v. TJH

Medical Svcs., P.C., 2008 NY Slip Op 5649; 52 A.D.3d 648; 861 N.Y.S.2d 697 (2d Dept. 2008); Pipia v. Nassau Cty., 34 A.D.3d 664, 666, 826 N.Y.S.2d 318, 320 (2d Dept. 2006).

Timberlake did not cure these fatal defects through her deposition testimony. While she identified a number of "clinical practices" and actions with which she disagreed and allegedly complained about (Ex. 13, pp. 104-09, 193-99), there was no "law, rule, regulation or declaratory ruling adopted pursuant to law" or "substantial and specific danger to public health or safety or a significant threat to the health of a specific patient" identified by Timberlake.

Beyond Timberlake's failure to satisfy the substantive predicates for asserting a claim under Section 741, there is also no evidence in the record that the decision to terminate her employment had anything to do with her alleged complaints. As detailed above, the Hospital's decision to terminate Timberlake's employment was based on her conduct, which was documented by three different supervisors. Timberlake's behavior and job performance over the course of the preceding year and her admitted refusal to cooperate in any manner with the Hospital's concerns regarding the unfiled patient documents found under her desk demonstrate the reasons for the Hospital's decision. Since Section 741 expressly provides that "[i]n any court action brought pursuant to this section it shall be a defense that the personnel action was predicated upon grounds other than the employee's exercise of any rights protected by this section," N.Y. Labor Law § 741(5), Timberlake's claim under Section 741 must be dismissed.

## CONCLUSION

For all the foregoing reasons, the Hospital respectfully urges that its motion for summary judgment be granted and that the Court dismiss the Complaint in its entirety.

Dated: New York, New York
      September 9, 2008

EPSTEIN BECKER & GREEN, P.C.

By: _____
James S. Frank (JF 5389)
Steven M. Post (SP 5968)
Attorneys for Defendant
250 Park Avenue
New York, New York 10177-1211
(212) 351-4500